YARRUT, Judge.
This suit arose out of an accident on March 21, 1964, at about 1:30 A.M., at the intersection of Chef Menteur Highway and Press Drive, in New Orleans. Plaintiff was stopped at a traffic signal when his car was struck in the rear by one driven by Miss Carol A. Bonnet, minor daughter of Defendant, L. M. Bonnet, who was insured by Defendant, National Union Insurance Company. Also named Defendants were Philip J. Hornung and The Employers’ Liability Assurance Corporation, Ltd. The car Miss Bonnet was driving was insured by Employers’ Liability in the name of Mrs. Philip J. Hornung. It was agreed by both insurers that Employers’ Liability was primarily liable and National Union Insurance Company secondarily liable.
The Jury returned a verdict for Plaintiff against Defendants, National Union Insurance Company, The Employers’ Liability Assurance Corporation, Ltd. and L. M. Bonnet, as tutor of his minor daughter, Miss Carol A. Bonnet, jointly and in solido, for the sum of $3650.00, with legal interest from judicial demand and all costs. The suit against Philip J. Hornung was dismissed.
The Jury’s award was made without stating the respective amounts allowed for property damage, lost wages, medical expenses and personal injuries. Plaintiff appeals, requesting an increase in the award. As liability is stipulated by Defendants, the only issue on appeal is quantum.
*118 The morning of the accident, Plaintiff went to Browne-McHardy Clinic, Veterans Highway Division, and was examined and x-rayed. The findings revealed moderate spasms and the diagnosis of a cervical sprain.
On March 24, 1964 Plaintiff saw Dr. Leo Labourdette, an internal specialist. Dr. Labourdette found marked spasms in the posterior neck muscle groups, neck rigidity, and diminished reflexes in the upper extremities. In foliow-up visits the findings were essentially static. However, on April 10, 1964, Plaintiff complained of pain in both shoulders, aggravated by head and neck movements. Dr. Labourdette felt this delayed pain onset possibly suggested nerve injury. Because no significant improvement was noted on subsequent followups, Dr. Labourdette referred Plaintiff to Fisher-Rabin Medical Center for physical therapy treatments, consisting of diathermy and traction. Later, he referred Plaintiff to Dr. Raymond Kitziger, an orthopedic specialist.
Dr. Labourdette testified that cervical strains generally tend to clear in four to six weeks and, if a patient fails to respond to treatment during that period, he refers the patient to an orthopedist for more specialized treatment. At the time of this referral, muscle spasms were still present although there was some improvement over the initial visit.
Dr. Kitziger first saw Plaintiff on June 23, 1964, at which time he observed Plaintiff held his head still during conversation and tilted it to the right side to avoid moving his head. He also noted palpable spasms in the right paravertebral group of muscles, with limitation of motion in the right neck and right rotation and bending. The findings were related mostly to the soft tissue structure of the neck and not to the bony substance. Dr. Kitziger referred Plaintiff for outpatient therapy treatments to the New Orleans Physiotherapy Clinic, explaining the purpose of physiotherapy is to make the patient as comfortable as possible while the injury heals. Plaintiff made six visits between June 26, 1964 and July 20, 1964, to the Clinic for therapy treatments. On July 14, 1964, the spasms had decreased, but on July 26, 1964, on Dr. Kitziger’s orders, Plaintiff was admitted to Mercy Hospital and placed in cervical traction for six days.
On August 4, 1964, Plaintiff still complained of pain and showed Dr. Kitziger a lump in the back of his neck, under the fatty tissue. Dr. Kitziger felt there might be some relationship to the neck ligaments, but could not be certain unless removed and physically examined. A possible explanation offered by Dr. Kitziger was that this mass could be related to the accident as it was possibly a tear of soft tissues and structures. At this time Dr. Kitziger did not find evidence of muscle spasms.
However, on a follow-up visit, August 31, 1964, Plaintiff still complained of neck pain and pain on his right side. Dr. Kitzi-ger stated that he had nothing further to offer Plaintiff from an orthopedic standpoint and referred him to Dr. Rayburn C. Llewellyn, a neurosurgeon, who performed a mye-logram at Mercy Hospital in December, 1964. Although the myelogram proved negative, Plaintiff continued his complaints.
Dr. Llewellyn’s examination of Plaintiff revealed a limitation of motion in the neck and upper extremities; soreness to palpation (manual manipulation) of the major neck ligaments in the mid and lower neck area; and swelling in the posterior cervical muscle at the base of the neck, which was due to muscle spasm.
Plaintiff discontinued his physiotherapy treatments in New Orelans in February, 1965, because he was getting no results. In August, 1965, his employer transferred him to Seattle, Washington. In September, 1965, Plaintiff consulted Dr. Eugene S. *119 Hunt, of Seattle, an osteopathic physician, who referred him to Dr. James W. Tupper, also of Seattle, an orthopedic specialist. Subsequently, he changed employment and moved to Roy, Utah.
On October 29, 1965, he made a 1000-mile round trip by bus to Denver, Colorado, to see Dr. Raymond M. Stuck, for a neurological consultation. Subsequently, Plaintiff obtained employment in Marietta, Georgia.
He testified that in June, 1966, he drove his automobile from Marietta, Georgia, to New Orleans, a 1200-mile round trip, in the hope of seeing at least one of the physicians who had treated him in the past. On this visit, he saw all three testifying physicians, Drs. Labourdette, Kitziger and Llewellyn. All three doctors were of the opinion Plaintiff had a residual ailment. Dr. Kitziger testified as follows:
“His symptoms are there and without hesitation, I could say I don’t know if they will disappear, or when they will disappear. But they are there. He did have a residual finding.”
Dr. Labourdette testified in his opinion Plaintiff would have some permanent residual pain in the cervical region, although it was possible that this symptom could subside to some degree at a later time.
Dr. Llewellyn also testified Plaintiff had “residual complaints” which could occur at indeterminate periods of time. When asked if the word “residual” was the same as “permanent”, he answered “yes”.
On the return trip to Georgia, Plaintiff was again involved in a rear-end accident. However, none of the testifying physicians saw him after that time and, therefore, their diagnoses of his condition were unrelated to the second accident.
To determine the amount Plaintiff was allowed for pain and suffering, we must first determine the allowable special damages, which we find to be as follows:
Automobile damages $ 250.00 Lost wages, March, 1964, through
December, 1964 446.00
Dr. Leo Labourdette 132.00
Dr. Raymond Kitziger 115.00
Dr. R. C. Llewellyn 150.00
Prescriptions 24.60
Browne-McHardy Clinic 25.50
Fisher-Rabin Medical Center 55.00
New Orleans Physiotherapy Clinic 36.00
New Orleans Physiotherapy Clinic 50.00
Mercy Hospital 218.30
Mercy Hospital 156.70
Dr. E. S. Hunt 60.00
Dr. J. W. Tupper 60.50
Dr. R. M. Stuck 35.00
Total $1,814.60
We are not allowing the following special damages claimed by Plaintiff:
(1) Lost wages due to four-day trip to New Orleans to consult the three testifying physicians; (2) bus fare for the 1000-mile round trip Roy, Utah, to Denver, Colorado; and (3) automobile expenses for 1200-mile round trip from Marietta, Georgia, to New Orleans, Louisiana.
There is no evidence that Plaintiff was required to take these long trips to receive medical attention because medical services were not available in the vicinity of the cities in which he was employed.
Because the special damages amounted to $1,814.60, the Jury’s award for pain and suffering was only $1,835.40. We find this amount to be inadequate and are increasing this award to $3,500.00. In doing so, we are, of course, aware that the quantum of a Jury should not be disturbed unless manifestly erroneous.
However, this is not a case in which there was conflicting medical testimony, leaving the Jury free to decide which physician’s diagnosis to accept. All three physicians testified Plaintiff had symptoms of cervical sprain over two years subsequent to the accident and that he would suffer residuals. On this basis, we find the Jury award was inadequate.
*120 Therefore, the judgment is amended to increase the total award from $3,650.00 to $5,314.60; otherwise, the judgment is affirmed; all costs in both Courts to be paid by Defendants.
Amended and, as amended, affirmed.